**UNITED STATES DISTRICT COURT EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF MAGNOLIA FLEET, LLC AND RIVER TUG LLC AS OWNER AND OPERATOR OF THE M/V LOUISIANA FOR EXONERATION FROM <br><br> AND/OR LIMITATION OF LIABILITY OPERATOR OF THE M/V LOUISIANA | CIVIL ACTION NO:  2:22-cv-00504 <br><br> DISTRICT JUDGE: HON. ELDON E. FALLON <br><br> MAGISTRATE JUDGE: HON. DONNA PHILLIPS CURRAULT <br><br> Admiralty – Rule 9(h) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

This suit involves a claim brought by Entergy Louisiana, LLC (Entergy) against the owner of the barge Kirby 17225, Vopak Industrial Infrastructure Americas St. Charles, LLC (Vopak) for alleged damages sustained to Entergy's protective cluster at its Waterford I & Facility during Hurricane Ida on August 29, 2021. Entergy asserts that the damage was due to the failure of Vopak to properly secure its barge in advance of Hurricane Ida which allowed it to break loose and damage Entergy's property. Vopak denies that its barge was improperly secured or that it collided with Entergy's protective cluster. These alternate views create a question of fact which must be resolved at trial. Consequently, this matter came on for trial before the Court, without a jury, on February 15, 2024.

After considering all of the testimony, exhibits introduced into evidence, and the applicable admissible portions of the record, the Court issues the following findings of facts and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court finds it as such and to the extent that any conclusion of law constitutes a finding of fact the Court finds it as such.

1

**FINDINGS OF FACT**

**A.   The Parties and the Relevant Vessels:**

1.      Entergy, an indirect majority owned subsidiary of Entergy Corporation, owns and operates the Waterford I & II Facility (Waterford Facility).

2.      Entergy's Waterford Facility is a stationary power generating facility located on the right descending bank of the Mississippi River at approximately Mile Marker 130 AHP ("ahead of the Pass").

3.      The Waterford Facility includes a fuel oil unloading dock (Fuel Dock) which consists of a protective 10 cluster arc of pilings on the upriver end and a central operations dolphin fronted by a breasting fender and flanked on both the upriver and downriver sides by a breasting dolphin. There is also an intermediate 4-piling dolphin to support a catwalk used to access the breasting dolphins from the central platform.

4.      The Fuel Dock is used to take on and offload fuel oil for the Waterford Facility and serves as protection for the water intake pipes running from the Mississippi River to the plant.

5.      The Fuel Dock at Entergy's facility is unmanned. Prior to Hurricane Ida, Entergy personnel inspected the dock four times per day by walking down the side and performing a visual inspection. Prior to the Hurricane, the last official inspection of the Fuel Dock occurred at 8:00 A.M. C.S.T. on August 29, 2021. At that time the Fuel Dock, including the catwalk and support pilings, were in good condition.

6.      Vopak is a limited liability company duly organized and existing under and by virtue of the laws of Delaware, with an office and principal place of business in Houston, Texas and is authorized to do and does business in the state of Louisiana.

7.      Vopak owns a facility in Taft, Louisiana located on the right descending bank of the Mississippi River in the vicinity of Mile Marker 127 and operates two docks at that facility: Dock 1 and Dock 2.

8.      Vopak utilized the Kirby 17225 as a deflector barge at its facility. The Kirby 17225's dimensions are approximately 260 feet long by 52.5 feet wide by 15.5 feet deep. At all material times, Vopak owned the Kirby 17225.

9.      The Vopak facility is downriver from the Entergy Waterford Facility. Dock 1 at the Vopak facility is located upriver from Dock 2. Dock 1 utilized the Kirby 17225 as a deflector barge permanently moored to three monopiles. Dock 2 utilized two barges, end on end, as deflector barges. The purpose of these deflector barges was to deflect any vessels, debris, or flotsam from colliding with the Vopak facility. Both sets of deflector barges have the same permanent mooring configuration: metal frames–three pieces of iron welded together with 90-degree corners forming a U–the base of which was welded to the barges' port side and formed a frame around each of the three pilings, a frame that was open on the far end with a 1.25-to-1.5-inch wire cable connected to each side of the open end with shackles. This mooring configuration allowed the deflector barges to rise and fall with the Mississippi River without having to adjust any lines.

10.     At all relevant times, a non-party Kirby Inland Marine, LP operated three tiers for fleeting around Vopak's facility at or near mile marker 127 on the lower Mississippi River. The three tiers were referred to as the 127 Fleet. Two of these tiers were located between the Entergy facility and the Vopak facility and one tier was located downriver from Vopak's facility. All of the barges fleeted in the Kirby facility were owned by Kirby.

**B.  Pre-Hurricane Preparation**

1. Vopak's hurricane plan contains no discussion of the preparation of the Dock 1 deflector barge, Kirby 17225, or its moorings in anticipation of a hurricane. The only method by which Vopak employees did inspect the Kirby 17225 is through visual inspection performed from Vopak's Dock 1, which is over 200 feet away from the Kirby 17225 and its moorings. Due to the location of Dock 1, a Vopak employee attempting to inspect the moorings of Kirby 17225 cannot see the moorings that secure the barge since the moorings are obscured from view.

2. Vopak does not conduct routine maintenance of the Kirby 17225 or its moorings.

3. Vopak performs annual inspections of Dock 1 as well as its shoreside terminal but simply failed to do so for the deflector barges, including the Kirby 17225. Vopak does not know whether the metal bracket or the cable or the shackle, all meant to secure the Kirby 17225, had been degraded or sustained damage before August 29, 2021. Vopak had access to vessels to perform close-up inspections of the mooring devices for the Kirby 17225 but did not use that access to perform any such inspection prior to Hurricane Ida.

**C. Hurricane Ida and Aftermath**

1. Hurricane Ida made landfall in Louisiana on August 29, 2021. At its peak, the winds reached 130 mph. The Carrolton Gauge readings showed that river levels at the Waterford Facility rose from four feet to over ten feet in twelve hours during the morning of August 29th with the last four-foot increase occurring over six hours. The water elevation peaked at 10.35 feet at 1:00 PM CDT on August 29.

2. As a result of the storm conditions and hurricane force winds the Mississippi River had a reverse surge and flowed upriver.

3. A number of barges, including the Kirby 17225, broke loose and flowed upriver in the direction of the Entergy Waterford Facility.

4.      After Hurricane Ida passed and the weather conditions improved, the Kirby 17225 was found grounded on a sandbar several hundred feet upriver from the Entergy Waterford Facility. There were also several other barges in the immediate vicinity or close to the Kirby 17225. *See* Trial Exs. 40, 45. The metal frames that were welded to the Kirby 17225 that Vopak used to secure the barge to the monopiles were either missing or badly damaged. Two of the frames appear to have been ripped at the weld seam. The credible evidence supports the conclusion that the Kirby 17225 broke loose from the Vopak facility due to faulty and inadequate moorings. This condition was known or could and should have been known by Vopak.

5.      The first inspection of the Entergy Fuel Dock following Hurricane Ida took place on September 2, 2021. Operator Juan Baptiste observed extensive damage and reported this condition to the Waterford Interim Plant Manager. A section of the catwalk was laying in the river and another section of the catwalk was loose and hanging by a bolt. There was a considerable dent in the dolphin supporting the catwalk in addition to damage to a light on the river side of the dolphin that was used to mark the location of the Fuel Dock for marine traffic. There was also damage to the wooden barge tie off point, including broken ties and gouging. Photos depicting the damage were taken and were introduced as Trial Exhibit 2.

6.      Between September 7 and 20, 2021, Entergy worked to mitigate the damage by removing the section of catwalk and barricading the open end to the catwalk. Entergy also notified the U.S. Coast Guard that the light on the dolphin marking the Fuel Dock was out.

7.      Entergy's marine surveyor, Jason Fernandes, inspected the damage to the Entergy Fuel Dock on September 10, 2021, several days after the storm, and concluded that some of the damage had recently occurred. He based this opinion on the color of the rust which he saw on a damaged portion of the dock. *See* Trial Transcript, 91:8 - 92:11. He did not perform any tests or

take any samples of the rust or perform any chemical analysis on it. *See* id. at 98:16-98:24 (describing that he relied upon his own observations and on photographs).

8.  Fernandes saw the barge, the Kirby 17225, 150 feet upriver lodged on a sandbar and was taken to the vicinity of the Kirby 17225 in a small boat by an Entergy employee so he could inspect the barge. He did what he describes as a "short inspection of the barge from the boat and from standing on the sandbar." *Id.* at 83:6 - 83:7. He visually identified "damages to the starboard side [of the Kirby 17225] as primarily being sustained due to contact with the Entergy Waterford I & II facilities, with the possibility of some damage on the port side as well having been sustained due to contact with Entergy's Waterford I & II facilities." *See id.* at 83:21-83:25. Again, Fernandes's conclusions about the cause of the damage were made by the color of the rust on the damaged Kirby 17225. No tests were made, no samples were taken to conduct further analysis, no measurements of the damage were made so it could be coordinated with the apparent damage on the fuel dock. Furthermore, Fernandes was not made aware that there were several other barges stuck on the same sandbar after the hurricane along with the Kirby 17225, or that there were other barges in the same vicinity which had broken loose during the storm. By the time Fernandes made his "short inspection," these other barges had been removed and the only vessel in the vicinity of the damaged Entergy Fuel Facility was the Kirby 17225. *See id.* at 99:7 - 99:12, 104:16 - 104:19.  He was also not told that before the Kirby 17225 passed, or even reached, the Entergy Fuel Dock, the Kirby 17225 had allided or came into contact with the fleeting tug, the Matagorda, which was servicing the Mile 127 Fleet, as well as with several barges in the Fleet. *See* Testimony of Captain Gary Bueltel (by Depo), 41:9  -41:25, 42:22 - 42:25.

9.  The above facts, which were unknown to Fernandes and, of course, not factored into his opinions, seriously undermine his conclusions as to the cause of the damage to the Kirby

17225 and the role it played in causing damage to the Entergy Fuel Facility. Furthermore, the fact that no one saw the Kirby 17225 collide with the Fuel Dock and the skimpy nature of Fernandes "short inspection" of the Kirby 17225 further weaken the credibility of his conclusions. At best, Fernandes's testimony is sufficient to prove that it is "possible" that the damage to the Entergy Fuel Dock was caused by an allision with the Kirby 17225. However, it is not sufficient to prove by a preponderance of the evidence that it is more likely than not that the damage to the Fuel Dock was caused by an allision with the Kirby 17225.

10.     Following trial, the Court instructed the parties to brief the applicability of the *Pennsylvania* Rule to this matter. The parties timely filed these supplemental briefs.

## CONCLUSIONS OF LAW

### I.     Jurisdiction

1.     This case arises under the Court's admiralty and maritime jurisdiction within the meaning of 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure. Venue is proper in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b)(2).

### II.     Negligence

1.     Under general maritime law, to prevail, the party asserting negligence must establish the following by a preponderance of the evidence: (1) duty; (2) breach of duty; (3) proximate cause; and (4) actual damage. *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010) (quoting *Canal Barge Co. v. Torco Oil Co.*, 220 F.3d 370, 376 (5th Cir. 2000)).

2.     The duty owed under maritime law in an allision case is one of reasonable care under the circumstances. *Theriot v. United States*, 245 F.3d 388, 40 (5th Cir. 2008). "That determination [of a tortfeasor's duty] involves a number of factors, including most notably the foreseeability of the harm suffered by the complaining party." *Consolidated Aluminum Corp. v.*

*C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987). A foreseeable harm "must bear some proximate relationship with the negligent conduct such that it can reasonably be said to be within the 'scope of the risk' created by that conduct.'" *In re Great Lakes Dredge & Dock Co.*, 624 F.3d at 212 (quoting *Consolidated Aluminum Corp.*, 833 F.3d at 67).

3.      When determining damages, courts restore the victim to its pre-tort condition and if replacement value extends the useful life of the damaged property, courts will depreciate the damages accordingly. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505-06 (5th Cir. 1994); *Cargill, Inc. v. Kopalnia Rydultowy Motor Vessel*, 304 F. App'x 278, 280-81 (5th Cir. 2008). In Brunet, the court looked to a case out of the Ninth Circuit to demonstrate when depreciation may not be applicable. *Brunet*, 15 F.3d at 505-06 (discussing *Oregon v. Tug Go-Getter*, 468 F.2d 1270 (9th Cir. 1972)). In the Ninth Circuit case, a bridge's pier was damaged, and that court declined to apply depreciation. According to the Fifth Circuit, the *Oregon* court "reasoned that the repairs did not add to the life expectancy because the pier was an integral part of the bridge structure, and regardless of the pier's condition it would have to be replaced when the bridge required replacement." *Id.* Courts thus look to the damaged property within its situational context.

**III.     Maritime Presumptions and the Act of God Defense**

1.      "Liability for collisions on the navigable waters is [often] governed by a series of presumptions and burden-shifting principles." *Illinois Constructors Corp. v. Logan Transp., Inc.*, 715 F. Supp. 872, 879 (N.D. Ill. 1989).

2.      The *Pennsylvania* Rule "concerns the burden of proving causation." *Turn Servs., LLC v. Gulf S. Marine Trans., Inc.*, 20-3012, 2023 WL 180028 at *8 (E. D. La. Jan. 13, 2023). For the *Pennsylvania* Rule to apply, "a party must demonstrate three elements: '(1) proof by a preponderance of evidence of violation of a statue or regulation that imposes a mandatory duty;

(2) the statute or regulation must involve maritime safety or navigation; (3) the injury suffered must be of a nature that the statute or regulation was intended to prevent." *Id.* (quoting *In re Marquette Trans. Co., LLC*, 292 F. Supp. 3d 719, 729 (E.D. La. 2018)). Upon this showing, the burden then shifts to the party in violation of a statute or regulation. "C.F.R. regulations are treated as statutory violations for purposes of the Pennsylvania Rule where those regulations apply." *Archer Daniels Midland, Co. v. M/T AMERICAN LIBERTY*, 545 F. Supp. 3d 390, 404-05 (E.D. La. 2021) (quoting *Tokio Marine & Fire Ins. Co., Ltd. v. M/V FLORA*, 235 F.3d 963, 966 (5th Cir. 2001)).

3.      When the *Pennsylvania* Rule applies, the party who has violated the statute or regulation has "the burden of proving that the violation could not have been a contributing cause of the allision." *Impala Terminals Burnside LLC v. Marquette Transportation Co.*, No. 19-12584, 2021 WL 1123566, at *6 (E.D. La. Mar. 24, 2021). In other words, "the burden rests on the ship of showing not merely that the fault might not have been one of the causes, or that it probably was not, but that it could not have been.'" *Otto Candies, Inc. v. M/V Madeline D*, 721 F.2d 1034, 1036 (5th Cir. 1983) (quoting *The Pennsylvania*, 86 U.S. 125, 136 (1873)).

4.      Like other evidentiary presumptions, discussed *infra*, the *Pennsylvania* Rule "gives way to factual realities." *Impala Terminals*, 2021 WL 1123566, at *6. A court finding the *Pennsylvania* Rule applies still conducts a typical negligence analysis because the Rule "concerns the burden of proof for showing causation; it does not determine ultimate liability for damages." *Impala Terminals*, 2021 WL 1123566, at *6 (citing *Sheridan Transportation Co. v. United States*, 834 F.2d 467, 478 (5th Cir. 1987)).

5.      Maritime actors in the Lower Mississippi River are subject to federal regulations that govern mooring requirements. 33 C.F.R. §165.803. The regulations apply to the "waters of

the Mississippi River between miles 88 and 240 above Head of Passes" although less strict mooring practices may be permitted from mile 127 to mile 240, as specified by certain provisions. *See, e.g.*, *id.* at §165.803(e)(1) (allowing barges secured to mooring devices between miles 127 and 240 to be secured at only the upstream end, as compared to miles 88 through 126 requiring both a downstream and upstream mooring); *id.* at §165.803(e)(2) (same, but applying to barges moored in tiers).

6.      Pursuant to 33 C.F.R. § 165.803(g), the person in charge of a barge, tier, fleet, or fleeting facility, must ensure that the barge, tier, fleet, or fleeting facility meets certain requirements set forth in § 165.803(d)-(e), and must ensure that "all mooring devices wires, chains, lines, and connecting gear are of sufficient strength and in sufficient number to withstand forces that may be exerted on them by moored barges." Person in charge is defined by the statute to include "any owner, agent, pilot, master, officer, operator, crewmember, supervisor, dispatcher or other person navigating, controlling, directing or otherwise responsible for the movement, action, securing, or security of any vessel, barge, tier, fleet or fleeting facility subject to the regulations in this section." *Id.* at § 165.803(a)(7).

7.      33 C.F.R. § 165.803(d) provides general mooring provisions and, of relevance, requires that "no person may allow a barge to be moored with unraveled or frayed lines or other defective or worn mooring."

8.      Unlike the *Pennsylvania* Rule, which deals with the presumption of causation, the *Louisiana* Rule deals with the presumption of breach. The *Louisiana* Rule "creates a rebuttable presumption that in collisions or allisions involving a drifting vessel, the drifting vessel is at fault." *Combo Maritime, Inc. v. U.S. United Bulk Terminal, LLC*, 615 F.3d 599, 602 (5th Cir. 2010) (citing

*James v. River Parishes Co., Inc.*, 686 F.2d 1129, 1131-32 (5th Cir. 1982)); *The Louisiana*, 70 U.S. 164, 173 (1865).

9.      "Application of [this presumption] does not supplant the general negligence determination which requires a plaintiff to prove the elements of duty, breach, causation and injury by a preponderance of the evidence." *Id.* at 605 (quoting *City of Chicago v. M/V MORGAN*, 375 F.3d 563, 572-73 (7th Cir. 2004)) (internal quotations omitted). The presumption operates to "shift the burden of production and persuasion on the issue of fault." *Id.* These presumptions fill an evidentiary vacuum and once "the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions," they become "superfluous." *Id.* (quoting *In re Mid-South Towing Co.*, 418 F.3d at 531) (internal quotations omitted).

10.      To rebut the foregoing presumption, a party "can demonstrate (1) that the allision was the fault of the stationary object; (2) that the moving vessel acted with reasonable care; or (3) that the allision was an unavoidable accident. . . . Each independent argument, if sustained, is sufficient to defeat liability." *Id.* (quoting *S/Y NERAIDA*, 508 F.3d at 493). The rebutting party must make such showing by a preponderance of the evidence. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 503 (5th Cir. 1994) (citing *American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988)).

11.      "The first route is essentially the contributory negligence route." *Id.* The second "requires the defendant to negate negligence." *Id.*

12.      A party invoking the Act of God defense does so pursuing that third argument, by showing "that the accident could not have been prevented by 'human skill and precaution and a proper display of nautical skills[.]'" *James*, 686 F.2d at 1133 (quoting *Petition of United States*, 425 F.2d 991, 995 (5th Cir. 1970)).

13.     Noting that the "common sense behind the rule makes the burden a heavy one," the Fifth Circuit has required vessels asserting the Act of God defense to "exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (quoting *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967)).

14.     The Act of God defense rebuts the causation element in a maritime negligence claim and will therefore relieve a party of liability even if their conduct was below the standard of care. *Combo Maritime, Inc.*, 615 F.3d at 606 (describing the Act of God defense's burden as "the most difficult burden on the defendant, because as a superceding [sic] causation argument it can free the moving vessel from all liability").

15.     To successfully invoke the Act of God defense, a party must show that the weather was unusually heavy and that they took "reasonable precautions under the circumstances as known or reasonably to be anticipated." *Petition of the United States*, 425 U.S. at 995. Therefore, a hurricane in of itself is not sufficient to invoke the Act of God defense. *See, e.g., In re Skanska*, 577 F. Supp. 3d 1302, 1323 (N.D. Fla. 2021) (finding that the barge owner "received ample warning about Hurricane Sally's approach" and its failure to relocate its barges to available, safer alternative locations constituted negligence and the vis major defense was thus unavailable to it); *Paragon Asset Co. Ltd. v. Gulf Copper & Manufacturing Corp.*, 622 F. Supp. 3d 360, 403-04 (S.D. Tex. 2022) (noting that while Hurricane Harvey undeniably brought bad weather, the Act of God defense was inapplicable because the vessel owner's "delayed decision and inadequate mooring system represented unreasonably deficient actions").

16.     The Fifth Circuit has stated that liability "must turn on whether the [vessel] causing the damage ought ever to have been in that predicament" and therefore the court examines the

actions taken in the days preceding a hurricane to assist in such an analysis. *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 82 (5th Cir. 1960) (discussing damage resulting from Hurricane Audrey).

## LIABILITY OF THE DEFENDANT

17.     Entergy seeks to recover damages from Vopak on the basis that Vopak was negligent in its mooring and storm preparations, and it is therefore liable for the Kirby 17225's breakaway and the subsequent damage to Entergy's Fuel Dock.

18.     Kirby 17225 was a drifting barge at the time of the allision with Entergy's Fuel Dock. Therefore, the Court finds that the *Louisiana* presumption facially applies to this set of facts. This presumption however became superfluous when the parties introduced evidence to dispel the vacuum these presumptions were designed to fill. Both parties have offered and introduced sufficient evidence in this matter and therefore the Court proceeds with Entergy's claim of negligence against Vopak.

19.     First, neither party disputes that maritime law imposes a duty of reasonable care under the circumstances. *See Theriot*, 245 F.3d at 40.

20.     On the question of breach, the Court finds Vopak negligent with respect to the mooring of the Kirby 17225. The credible evidence introduced at trial demonstrated that Vopak undertook no inspections of the mooring arrangement in the leadup to Hurricane Ida beyond a "visual inspection" from several hundred feet away, from which vantage point an observer cannot see the condition of the mooring devices. This is not the exercise of reasonable care and accordingly Entergy satisfied its burden of showing that Vopak breached its duty with respect to ensuring the Kirby 17225's moorings were adequate.

21.     This Court has previously held that "a violation of 33 C.F.R. §165.803(e) falls under the *Pennsylvania* rule's ambit because that regulation is designed to prevent breakaways by mandating mooring arrangements that would reduce the likelihood of such breakaways." Order Denying Summary Judgment, R. Doc. 503 at 10 (citing *Conagra, Inc. v. Weber Marine, Inc.*, 97-1019, 98-3829, 2000 WL 943198, at * 5 (E.D. La. July 7, 2000)).

22.     Vopak is subject to this regulation.[1] Vopak satisfies the statutory definition of "person in charge" because it was the owner of the Kirby 17225 barge and was "responsible for the movement, action, securing, or security" of the Kirby 17225. *See* §165.803(a)(7). Additionally, §165.803(g), titled "Mooring: person in charge," provides that the person in charge of a barge "shall ensure that the barge . . . meets the requirements in paragraphs (d) and (e)," that is, the mooring requirements. While these regulations also apply to fleets and fleeting facilities, and some paragraphs specify that they apply to fleet operators only, paragraphs (d) and (e) are not so narrow. Vopak is thus subject to 33 C.F.R. §165.803 to the extent that it is a person in charge of the Kirby 17225 barge.

23.     The Court finds the *Pennsylvania* Rule applies to this case. First, §165.803(g) imposes a mandatory duty on a barge owner to comply with paragraphs (d) and (e). *See* § 165.803(g)(1) ("The person in charge of a barge, tier, fleet or fleeting facility *shall* ensure that the barge, tier, fleet or fleeting facility meets the requirements in paragraphs (d) and (e) of this section.") (emphasis added). Entergy has shown by a preponderance of the evidence that Vopak violated §165.803(d). By failing to inspect the Kirby 17225's moorings regularly, and especially in the leadup to Hurricane Ida, Vopak could not and did not ensure that the moorings were not

---

[1] Contrary to Vopak's position in post-trial briefing, 33 C.F.R. §165.803 is not only applicable to fleet operators. §165.803(a) contains definitions as used in this regulation and while "fleet" and "fleet operators" are defined terms, so too is "person in charge." Further, §165.803(g) requires that the "person in charge" ensure compliance with paragraphs (d) and (e).

14

defective or worn. Second, this regulation involves marine safety and navigation because it pertains to the way vessels are moored, thereby aiming to prevent breakaways and maintain the navigability of the Lower Mississippi River. Third, the injury suffered in this case, the damage to Entergy's property by a breakaway barge, is the type of injury that §165.803 aims to prevent. Therefore, the *Pennsylvania* Rule applies and creates the rebuttable presumption that Vopak's inadequate mooring and violation of §165.803 caused the damage to Entergy's property.

24.    Vopak thus has the burden of proving that its violation of this regulation, that is, its inadequate mooring of the Kirby 17225, could not have caused the damage to Entergy's property. Vopak has not met this burden. Vopak points to Kirby Inland Marine's 127 Fleet and its breakaways to inject doubt as to *which* barge may have caused Entergy's damages, however this is not enough to overcome the *Pennsylvania* Rule's presumption. Vopak needs to prove more than that its breakaway barge was *probably* not the cause; it must show that it *could not* be the cause. The fact that a nearby operator, and non-party to this suit, also suffered breakaways in Entergy's and Vopak's vicinity is not enough to satisfy its burden of proof.

25.    Additionally, in its post-trial briefing on this matter, Vopak suggests that the Court find the *Pennsylvania* Rule applicable to non-party Kirby Inland Marine because no evidence was put forth to show its compliance with §165.803 and urges the Court to find Kirby Inland Marine liable for Entergy's damages. *See* R. Doc. 621 at 4-5. This is a misapplication of the *Pennsylvania* Rule. A brief procedural history of the present case is in order to contextualize this argument.

26.    Before this Entergy-Vopak matter was severed from the larger limitation action at the joint request of the parties, *In re Magnolia Fleet & River Tug*, Kirby Inland Marine was a claimant in that action and had filed a motion for summary judgment urging this Court to dismiss Entergy and Vopak's (as well as other parties') cross-claims against it because all of these cross-

claims argued that Kirby vessels *within the 120-125 mile markers* caused the parties various damages. R. Doc. 394. Kirby had fleeted several of its vessels at another fleeting facility within mile markers 120-125, a facility managed by Turn Services. In its summary judgment motion, Kirby had argued that it was Turn Services who had the care, custody, and control of these vessels and therefore if any of these vessels broke away and damaged the cross-claimants, Kirby was not the one liable. R. Doc. 394-1 at 11-15. Vopak did not oppose this motion, R. Doc. 435, and Entergy initially opposed it, arguing that its cross-claim against Kirby was more expansive than simply the vessels fleeted within miles 120-125, R. Doc. 415, but then later withdrew its opposition, R. Doc. 569. The Court granted Kirby's motion for summary judgment. R. Doc. 571. Subsequently, the limitation proceeding resulted in various settlements among the parties and Entergy and Vopak sought to sever their matter from the greater proceeding on the grounds that discovery demonstrated that the Mile 122 Magnolia Fleet's breakaways did not drift as far upriver as their facilities. The Court thus severed this matter. R. Doc. 602. Kirby had been dismissed by this time.

27.    At trial, Vopak introduced the deposition of Captain Gary Bueltel of the tugboat Matagorda, the fleet boat for Kirby's 127 Fleet. Bueltel Depo., R. Doc. 614-1. Bueltel testified by deposition that he was aboard the Matagorda on August 29, 2021 when Hurricane Ida struck the area and that all of 127 Fleet's vessels broke away during the storm. Bueltel Depo., 30:3-34:1. He testified specifically that he recalled Vopak's barge, the Kirby 17225, breaking loose before he and his tier did because the Kirby 17225 "broke loose, hit my vessel. And a few minutes after that is when my tier started breaking apart." *Id.* at 40:19-40:21 (initially misidentifying Vopak as "Valero" before correcting himself). He testified that visibility by this time was so poor because of the dark hour and weather conditions that he did not see any vessel make contact with the Kirby 17225 or cause it to break loose. *Id.* at 42:1-42:19.

28.     Based on this evidence, Vopak urges the Court to apply the *Pennsylvania* Rule to

Kirby Inland Marine because "[w]ith no evidence that Kirby complied with the several mooring

practices required by 33 C.F.R. §165.803, the application of the *Pennsylvania* Rule against Kirby

is appropriate." R. Doc. 621 at 5. However, this is an inversion of the Rule. For the Rule to apply,

a party must show by a preponderance of the evidence the *violation* of a regulation, not that a party

show evidence of *compliance* with a regulation and that, absent evidence of compliance a violation

occurred. Kirby Inland Marine was no longer a party to this lawsuit by the time of trial, and further,

neither Entergy nor Vopak put forth sufficient evidence to show that Kirby's 127 Fleet violated

any regulations or statutes. The Court will not stretch the *Pennsylvania* Rule so far.

29.     The Court turns now to the question of damages. At trial, Entergy put forth evidence

of damages in three categories: (1) temporary repairs already conducted by Atlas SSI; (2) estimated

cost to repair the catwalks and catwalk support structure from Stewart Construction; and (3)

estimated cost to repair the breasting dolphin, as opined by Entergy engineering expert Bill

Thomassie. The credible evidence at trial supports Entergy's entitlement to these damages.

30.     Entergy paid Atlas SSI $380,199.062 to perform temporary repairs in the

immediate aftermath of Hurricane Ida given the danger the structures posed to River traffic and

property. As Craig Lucia testified at trial,

> Q: And there was a sense of urgency on Entergy's part about
> addressing the damage that had been found in the river?
> A: Yes. I was told immediately do what I had to do to get it out of
> the river because we do not want to be responsible to damage
> anybody else's property.
> Q: Okay. And when you say 'responsible for damaging anybody'
> else's property,' what do you mean by that? As a consequence of
> what?

---

2 There are two invoices that capture the expenses associated with these temporary repairs and together totaled
$381,662.56. *See* Trial Ex. 3-1, 3-4. Upon audit of these repairs, Entergy and Atlas SSI discovered that Entergy had
been mistakenly overbilled by $1,463.50 in relation to the first invoice and this amount was refunded. Trial. Ex. 3-
47. Accordingly, the expenses associated with these temporary repairs are $381,662.56 - $1,463.50 = $380,199.06.

> A: So, there is a nuclear plant next door to us that we own. We didn't want this to break loose and get into anybody' else's intake structures. …
> Q: Were you also concerned about your navigational responsibilities for traffic in the river?
> A: That's correct.
> Q: If you could explain for the Judge why you were concerned about that.
> A: Without those lights being there at nighttime, it's quite dark in the river, so that's really the only way that tugs or barges know coming in, you know, going up and down the river there is something over there, and they use them as navigational beacons.
> Trial Transcript, 11:25 - 13:3.

31.     Atlas SSI was tasked with completing these temporary and immediate repairs and the parties introduced the associated invoices as trial exhibits to support the expenses. No credible evidence was offered to refute the necessity of these repairs nor the reasonableness of the cost. Accordingly, the Court finds Entergy has proven it is entitled to $380,199.06 in these temporary repair costs already incurred.

32.     Entergy received a cost estimate from Stewart Construction to perform the repairs to the catwalks and catwalk support structures for $995,000. Trial Ex. 32. Scott Stewart of Stewart Construction testified at trial regarding the estimate provided to Entergy and no credible evidence was offered to refute the necessity of these anticipated repairs nor the reasonableness of their cost. In fact, at trial, several witnesses (including Stewart) testified that the estimate of $995,000 was likely less than would need to be spent because work along the Mississippi River is unpredictable and highly dependent on weather and other environmental conditions. Lucia testified to this fact as follows:

> Q: What is your experience typically with an estimate, about whether it's on target, low, or it's usually going to cost more?
> A: An estimate on a river, typically prices will go up.
> Q: And why is that, in your experience?
> A: In my experience, you can't – you can't predict what the river is going to do, so if they come out there one day, if the water is not

18

safe, divers can't' get in, you're just sitting there. The expensive cost for us is the mobilization and demobilization, which, as you can see in one of the exhibits, is, like, $70,000 to get them out there. And every day they are there, it's just costing them money, so if they can't work, it just costing money.

Trial Transcript, 22:13 - 23:1.

33.     Similarly, Scott Stewart testified as follows:

Q: If you had to mobilize and demobilize on multiple occasions, what would happen to the price?
A: It would go up.
Q: Based upon your experience in working on other projects, have you had to mobilize and demobilize on other projects in the past?
A: Yes, sir.
Q: Why does that occur?
A: As mentioned previously by the former person sitting here, the river can change quickly and without much notice. This work would have had to have been permitted because of the piledriving into the river bed. There are permitting restrictions based on river levels. If the river were to go over that level, you would not be able to drive the pilings, so you could theoretically mobilize and not be able to do it because the river could jump above that height. Additionally, safety is a big factor on the river. These are divers working underwater in zero visibility. If the current is too strong or changes, we would have to demobilize until the river conditions are calmer.

Trial Transcript, 33:22 - 34:17.

34.     Both witnesses testified that given these variables, the $995,000 estimate for these repairs is reasonable and on the lower end of what would be expected, given how much conditions change and how these changes raise the cost. No credible evidence was put forth to refute either the necessity of these repairs nor the reasonableness of the cost. The Court finds Entergy has proven it is entitled to $995,000 for these estimated necessary repairs to the catwalks and catwalk support structures.

35.     However, evidence was put forth addressing depreciation as to these items. Engineering expert Bill Thomassie testified at trial and opined in his expert report that the catwalks

themselves were approximately 10% through their expected lifespan and that the catwalk support

structures were likely 20-25% through their expected lifespan. When asked by the Court at trial

how this influences damages, he testified as follows:

> [The Court] Q: How would that translate into the damages? Would
> you take 10 percent off of the damages?
> A: It depends on how the Court and Your Honor interprets
> applicability. I did comment on depreciation in my report. There is
> one line of logic that would say that, yes, 10 or 20 percent would be
> - - would be the way to look at it. Another way to look at it would
> be as if - - of a tire that was on an automobile was popped and needed
> to be replaced, it didn't increase the value of the facility, so is
> somebody due only for the remaining value of the tire or a new tire;
> so it's probably a legal conclusion.
>
> Trial Transcript, 133:7 - 133:18.

36.     The parties discussed depreciation only within the context of this damage item –

the estimated cost to repair the catwalks and catwalk support structures. The Court acknowledges

that the Stewart Construction estimate does not break down costs by line item nor divide the costs

between the catwalks themselves and their support systems but estimates the cost to repair them

together. This makes sense given the testimony and evidence about mobilization and

demobilization and that the parties expect the repairs to the catwalks and to the support structures

to be simultaneously.

37.     Depreciation however is not necessary in every case, and the Fifth Circuit explained

in *Brunet v. United Gas Pipeline Co.* that when "repairs do not extend the useful life of the property

as it existed just before the collision, there should be no deduction for depreciation." 15 F.3d at

505-06. Here, Thomassie opined that while these particular items were at various (early) points in

their expected life spans, "the replacement of the two walkways and their support structures with

new in-kind structures would not affect any depreciation assessment of the fuel oil dock facility as

a whole." Trial Ex. 31-11. No evidence was introduced to refute this opinion and the Court finds

Thomassie's opinions on the matter credible. Accordingly, the Court finds that depreciation does not apply in this context.

38.     Entergy also seeks $125,000 in anticipated repair costs to the torn rubber fender on one of the breasting dolphins, as opined by engineering expert Bill Thomassie. At trial, Thomassie testified that the damages were relatively minor but require repairs and provided this as a reasonable estimate. No credible evidence was offered to refute the necessity of these repairs nor the reasonableness of the cost. Entergy has thus proven it is entitled to $125,000 in anticipated reasonable and necessary repairs to its breasting dolphin.

39.     In total, Entergy has proven it is entitled to damages in the amount of $1,500,199.06, consisting of the incurred expenses for the temporary repairs, the estimated cost to repair the catwalks and supporting structures, and the estimated cost to repair the breasting dolphin. Because the Court finds that Entergy has carried its burden with regard to the elements of duty, breach, and damages, and that Vopak has failed to rebut the presumption of causation pursuant to the *Pennsylvania* Rule, the Court must find Vopak liable to Entergy for these damages in the amount of $1,500,199.06.

New Orleans, Louisiana, this 25th day of March, 2024.

_____
United States District Judge